IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED

AUG 3 0 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| JOHN P. O'CONNOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MARK R. COLLINS, Badge No. 12; | ) |
| MICHAEL J. DeLAURENTIS, Badge No. 10; | ) |
| JOHN CARPINO, Badge No. 3; and | ) |
| MICHAEL J. TOOMEY, formerly Chief | ) |
| of Police and Badge No. 1, | ) |
| of the OAKBROOK TERRACE POLICE DEPARTMENT; | ) |
| WILLIAM J. KALLAS, formerly Mayor of the | ) |
| City of Oakbrook Terrace; | ) |
| VILLAGE OF OAKBROOK TERRACE (OAKBROOK | ) |
| TERRACE POLICE DEPARTMENT); | ) |
| EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED | ) |
| STATES, now known as AXA FINANCIAL GROUP; | ) |
| MARVIN ROTTER and MARVIN ROTTER AGENCY; | ) |
| JOHN C. PASSANANTI; | ) |
| SUSAN IWEMA; | ) |
| PATRICK J. CAULFIELD; | ) |
| MICHAEL W. BRODY; | ) |
| KENNETH S. SPRINGER; | ) |
| MICHAEL J. ARMITAGE | ) |
| d/b/a ARMITAGE & ASSOCIATES; | ) |
| JUDGE ROBERT K. KILANDER, | ) |
| PAUL H. NOLAND, JR.; | ) |
| JUDGE KENNETH MOY; | ) |
| JOSEPH BIRKETT; | ) |
| JUSTICE ROBERT R. THOMAS; | ) |
| DOUGLAS C. TIBBLE; | ) |
| BRENT R. AUSTIN; | ) |
| STEVEN R. LEVIN; | ) |
| LINDA E. SPRING; | ) |
| JOHN N. PIEPER; | ) |
| LUCY BEDNAREK; | ) |
| McDERMOTT, WILL & EMERY; | ) |
| WILDMAN, HARROLD, ALLEN & DIXON; | ) |
| McBRIDE, BAKER & COLES n/k/a HOLLAND & KNIGHT; | ) |
| ANCEL, GLINK, DIAMOND, COPE & BUSH; | ) |
| KUBIESA, SPIROFF, GOSSELAR & PIEPER; and | ) |
| JOHN DOE and others not presently known, | ) |
| | ) |
| Defendants. | ) |

No

02C 6219

JURY DEMAND

JUDGE MORAN

MAGISTRATE JUDGE BOBRICK

DOCKETED
AUG 3 0 2002

COMPLAINT

1. This is a civil action seeking damages against defendants
for committing acts under color of law, or for conspiring and

aiding those defendants who committed acts under color of law, which acts deprived plaintiff of rights secured by the United States Constitution and laws of the United States. Defendants, while acting in their official capacities as police officers in the City of Oakbrook Terrace, County of DuPage, State of Illinois; as circuit court trial judges in Illinois' 18th Judicial District, in the City of Wheaton, Illinois, County of DuPage, State of Illinois; as state appellate justices in Illinois' Second Appellate District in the City of Elgin, County of Kane, State of Illinois; as Illinois Supreme Court justices in the City of Springfield, County of Sangamon, State of Illinois; as the DuPage County State's Attorney in the City of Wheaton, County of DuPage, State of Illinois; as the Mayor of the City of Oakbrook Terrace, County of DuPage, State of Illinois; and all other defendants who assisted, collaborated and conspired to aid the aforementioned defendants while acting under color of law, deprived plaintiff of substantive and procedural due process as guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States and also deprived plaintiff of his constitutional right to use the state and county courts of Illinois to seek redress for injuries suffered on account of tortious conduct. Defendants' acts also constitute hate crimes against plaintiff and unlawful retaliation against a whistleblower as prohibited by 18 U.S.C. §241 and §242. Defendants' actions towards plaintiff also constitute unlawful racketeering, which is prohibited by 18 U.S.C. §1962.

2

2. This Court has jurisdiction of this case under 42 U.S.C. 1983 and 18 U.S.C. 1964.

3. Plaintiff, JOHN P. O'CONNOR, is a citizen and resident of the State of California and a citizen of the United States.

4. I worked as an insurance agent for defendant Equitable from December 1, 1989 until July 1, 1992. During that time I was assigned to defendant Marvin Rotter's Equitable agency. I was located in his office that was in the Village of Oakbrook Terrace, Illinois. My immediate supervisor was defendant John Passananti. Passananti fired me on July 1, 1992, which was just before I was to bring into the office the pension business of a large trade association. The first year commission on that business was $300,000 and $100,000 per year thereafter for at least 15 years, which sums Passananti would have had to split with me if I had remained at Equitable. Only Passananti, defendant Susan Iwema, Passananti's secretary, myself and two unidentified large white males in plain clothes were present in Equitable's office when I was fired. After I cleaned out my desk and was bringing my belongings to my car, I was threatened with bodily harm if I made any trouble by the two large white males.

5. About a week after I was fired, I called Marvin Rotter. At that time, Rotter informed me he had spoken with Passananti and Passananti had told him that the two white males at my firing who threatened me were clients of Passananti (In 1996, Susan Iwema confirmed this fact to me).

6. About six months after my firing, some person filed a complaint against Passananti with the National Association of Securities Dealers. That complaint alleged that Passananti had had his office receptionist forge more than 80 signatures on a 401(k) pension plan. Within a week of Equitable being informed of the NASD investigation, Equitable, apparently because they thought I was the anonymous complainant, hired three private investigators to go after me. Two of those investigators were defendants Kenneth Springer and Michael J. Armitage. Springer and Armitage had a meeting with Passananti on December 17, 1992 during which meeting Passananti falsely accused me of having stalked him and his family and former co-employees at Equitable and their families. Passananti also falsely stated at that time that I had made unsolicited homosexual advances to him while I worked for him at Equitable. Lastly, Passananti stated to the investigators that he believed I was the "whistleblower" who had filed the complaint against him with the NASD.

7. At that time, I had been hired as an insurance agent by TransAmerica Insurance located in Oak Brook, Illinois. On February 19, 1993, I and my current supervisor at TransAmerica met with Armitage and the third investigator hired by Equitable, ostensibly to talk about my knowledge of Passananti's business practices in relation to the NASD complaint. Once the meeting began, defendant Armitage did not ask about Passananti's business practices but immediately stated Passananti's false stalking and homosexual allegations to me in front of my current supervisor at TransAmerica

4

in an attempt to get me fired from my new job. Armitage then claimed that Passananti had filed a stalking police report against me with the Oakbrook Terrace Police Department, but Armitage then refused to provide me with a copy of that report or its date or number.

8. After that meeting, I went to the Oakbrook Terrace Police Department on three separate occasions and made three unsuccessful Freedom of Information Act requests to get a copy of the stalking report. Each time, the Police Department's records clerk, after looking in the Department's file room and computer, said to me that no such report existed. On March 22, 1993, I received a written statement from the police department that no reports had been filed against me by Passananti or anyone else.

9. Because I knew that the private investigators had attempted to get me fired from my new job at TransAmerica by making the false stalking and homosexual allegations in front of my new TransAmerica supervisor, I hired private counsel to file a defamation and invasion of privacy action against Passananti, Rotter, Armitage, and Equitable in the Circuit Court of DuPage County. That suit was filed in June of 1993 (93 L 1223 (DuPage County)).

10. Prior to filing that suit, I contacted defendant Patrick J. Caulfield, Vice President and Associate General Counsel of Equitable, about obtaining a copy of my personnel file and a copy of the stalking report. Caulfield responded by saying it was unnecessary to send me a copy of my personnel file because it did not contain any disciplinary materials or filings but only my job

5

application and security clearance materials. I then told Caulfield that I had been fired just before I brought sizeable pension business to Equitable. Caulfield stated he knew nothing about this but he would look into it and would also attempt to find a copy of the police report. He then stated he would contact me about these matters.

11. Caulfield never called me back. I then had my trial attorney file the aforesaid defamation suit. At that time, defendant Robert R. Thomas was a DuPage County Circuit Court trial judge assigned to the Law Division in the Wheaton Courthouse. Because I had been told on many occasions by Passananti that Judge Thomas was a close friend of his from the days when they both played professional football in the NFL and that Judge Thomas was also an insurance business client of Passananti's, I told my attorney to make a "Motion for a Change of Judge" if my lawsuit happened to be assigned to Judge Thomas. However, this did not happen. My suit was assigned to defendant Circuit Court Judge Robert K. Kilander.

12. After my lawsuit was filed, Caulfield telephoned my trial attorney and asked him to get me to dismiss the suit because he said it was frivolous. My trial attorney asked for a copy of the stalking report and also affidavits from Equitable employees who supposedly had been stalked by me. My attorney then told Caulfield he would recommend to me that I dismiss the lawsuit if Caulfield could produce evidence that I had done the stalking that I had been accused of. Three days later my trial attorney received a faxed

letter on Equitable stationery which was signed by Caulfield and defendant Michael W. Brody, who was identified as Vice President and Counsel of Equitable. That letter did not contain a copy of the stalking report or any affidavits from Equitable employees. It merely restated the false stalking allegations made by Passananti to the two investigators on December 17, 1992. In response, my trial attorney faxed a letter to Caulfield which refuted the false accusations contained in the Equitable letter. That letter again pointed out that I had checked with the appropriate police department and had been told there was no record of any police report having been filed against me. My attorney received no response from Caulfield. Instead, on November 24, 1993, defendant Douglas Tibble, a partner with McDermott, Will & Emery, filed his appearance for Equitable. He was assisted by defendant Brent Austin. (Subsequently, defendant Linda Spring filed an appearance for Michael Armstrong.)

13. Passananti then filed a countercomplaint which falsely alleged numerous incidents of supposed stalking by me but contained no dates or times. (The countercomplaint also alleged that I had stalked and harassed Passananti and a number of Equitable employees over the phone.) That countercomplaint was signed by defendant attorney Steven R. Levin. After Levin filed an amended countercomplaint for Passananti which falsely asserted over 45 specific instances of supposed stalking of Passananti and his family and also sexual harassment of Passananti by me but did not contain specific times, Equitable raised the defense that the

investigators it hired had a conditional privilege to make the defamatory statements in front of my TransAmerica supervisor during the February 19, 1993 meeting because of the supposed fact that I was a very dangerous individual who had terrorized my former supervisor and co-employees at Equitable by stalking them. In the amended countercomplaint, Passananti claimed for the first time that the two white males who threatened me while I cleaned out my office desk after being fired were actually two Oakbrook Terrace police officers who Passananti had called to Equitable's office because I supposedly was so dangerous.

14. In support of this conditional privilege defense, the Oakbrook Terrace Police Department fabricated a shift summary for my July 1, 1992 firing, a copy of which I obtained via a FOIA request. That shift summary falsely indicated that defendant Lt. John Carpino and defendant Sgt. Michael DeLaurentis had attended my firing and watched me while I cleaned out my desk. However, that shift summary indicated that those two officers had been dispatched to the Equitable office 45 minutes after I left the premises. I could prove when I left the offices by my cellular phone records. When I got the copy of the shift summary, I encountered Lt. Carpino. I had never seen him before. When I told Carpino I did not see him at my firing, he became defensive and stated he would testify he was there at trial and he would be believed over me because he was an experienced police officer.

15. After my first attorney withdrew and I represented myself, the attorneys for Equitable and Passananti and the attorney for

defendant Armitage refused to produce Passananti or Armitage for their discovery depositions, despite the fact that deposition subpoenas had been properly served upon Equitable and Armitage by my trial attorney. Judge Kilander also refused to compel those two individuals to attend their scheduled depositions despite many requests made by me after my trial attorney withdrew his appearance for me.

16. Before he withdrew, my trial attorney also served proper interrogatories and document production requests upon Equitable, Passananti and Armitage, all of which requested a copy of the stalking report supposedly filed by Passananti against me with the Oakbrook Terrace Police Department. The defendants filed their discovery responses in January of 1995. In those, the Equitable, Passananti and Rotter refused to answer all but a few of the interrogatories and also refused to turn over any of the requested documents. However, in those responses, Equitable admitted that it had in its possession a copy of the stalking report that Passananti supposedly filed against me and that they would turn it over as soon as a confidentiality order was entered by Judge Kilander. Subsequently, a confidentiality order was entered by Judge Kilander, but Tibble still refused to turn over a copy of that report to me. When I told Mr. Tibble I would file a motion to compel to get the police report, Tibble stated that if I did this, he would tell all of the judges in the 18th Judicial District (DuPage County) that I had a homosexual relationship with the person I rented from, who worked in the DuPage County Courthouse.

9

Judge Kilander again refused to order Equitable to turn over a copy, despite many requests by me that he do so. Up to that point, I received virtually no discovery whatsoever.

17. Although I was not allowed to take the deposition of Passananti or any other important witness, my discovery deposition was taken on September 21, 1994. During that deposition, Steven Levin asked me whether it was not true that I was in love with John Passananti and wanted to have sex with Passananti. After I had denied those false charges, Mr. Levin asked me if I wanted to have sex with Passananti's small children. After I denied that outrageous question, Mr. Levin asked me about the anonymous complaint letter sent to the NASD which claimed that Passananti had his office receptionist forge signatures on a pension plan.

18. Just before my discovery deposition was taken, Mr. Tibble sent out deposition subpoenas to, among others: my doctor, his wife, a close female friend of mine who I'd known since high school, and five co-employees at TransAmerica with whom I had worked for only 3 to 4 months. Each of those subpoenas requested that the person to whom it was directed bring any and all photographs of me engaging in homosexual acts that they had in their possession. None of those depositions was ever taken.

19. Four weeks after the discovery responses were filed, the Equitable, Passananti and Rotter filed a Motion for Summary Judgment which was based on the claim of conditional privilege that was founded on Passananti's false stalking allegations against me. However, that Motion was supported only by Passananti's affidavit.

10

None of the other persons who I supposedly stalked filed supporting affidavits. Armitage also filed a Motion for Summary Judgment, but prior to the hearing on the Summary Judgment Motions, I dismissed Armitage as a defendant. I then asked Judge Kilander for a continuance so I could cite supporting cases in my response to Equitable's Summary Judgment Motion. He denied that request. Despite the fact that I had denied each and every one of the false stalking allegations in my pleadings that answered the summary judgment motion and had received virtually no discovery from the opposing parties, Judge Kilander entered summary judgment in favor of Equitable on May 17, 1995. (Equitable's attorneys also requested and were granted a judgment against me in the amount of $362.80 for an appearance fee and witness deposition fees.) I then appealed to the Second Appellate District (Appeal No. 2-95-739).

20. With the help of the Illinois Attorney General's office, the Oakbrook Terrace Police Department was recontacted and a request again was made for a copy of the stalking report. Approximately three months after the summary judgment was entered for Equitable, I received in the mail a packet from the Oakbrook Terrace Police Department with a cover letter from then Chief of Police, defendant Michael J. Toomey. That packet contained a copy of a stalking report allegedly filed by Passananti against me on December 18, 1992. The responding officer on that report was identified as defendant Patrolman Mark R. Collins. Although that report contained claims by Passananti which were similar to those

11

contained in Passananti's pleadings as to my supposed stalking, the dates for the stalking incidents were all different.

21. Because the date discrepancies contained in the December 18, 1992 police report would have prevented the entry of summary judgment for Equitable since those discrepancies would have created a material question of fact as to Equitable's claim of a conditional privilege, my appellate attorney attempted to supplement the record on appeal in Appeal No. 2-95-739 with a copy of that police stalking report. After Mr. Tibble filed objections, the Second Appellate District denied that request. I later learned that that denial order was signed by Robert R. Thomas, who at that time had been elected a Justice of the Second Appellate District.

22. On March 7, 1996, oral argument in my appeal of the summary judgment entered in favor of Equitable was held at the Northern Illinois University College of Law. That oral argument was then videotaped without authorization by Illinois Supreme Court order as required and without my permission, and subsequently that videotape was sold to Jones Cablevision, a commercial cable television company located in Wheaton, Illinois. Jones Cablevision later played that videotape on its "Legal Ease" program which was broadcast into all of the counties in northern Illinois four to six times during 1996. The broadcast of that tape by Jones Cablevision was also done without my knowledge or permission. During the rebuttal portion of the oral argument, Justice Thomas stated on the record the majority of the false stalking allegations raised by Passananti against me, including the worst one, that I supposedly

12

had stalked one of Passananti's young children, as if I never had denied those false allegations in my responsive pleadings. At that time, I sold TransAmerica insurance policies primarily in the counties of northern Illinois, which is the same "prospecting" area I used when I was employed at Equitable.

23. I later investigated the circumstances surrounding the videotaping. I telephoned involved individuals at Jones Cablevision, at the Northern Illinois University College of Law, at the Clerk's Office of the Second Appellate District, and at the Kane county Bar Association, which had sponsored the Legal Ease program. I received the following account from those persons: that Justice Thomas alone orchestrated the videotaping of the March 7, 1996 oral argument and the subsequent replay of that videotape on cable television; that Justice Thomas had the videocameras placed in the law school's moot courtroom and arranged for operators to man those cameras; that Justice Thomas took the videotape to Jones Cablevision; that Justice Thomas received money for the videotape from Jones Cablevision; and that Justice Thomas told Jones cablevision to play that videotape on its Legal Ease program.

24. After my appellate attorney put these facts in a pleading filed with the Illinois Supreme Court in a related case and supported by my affidavit, Justice Thomas filed an Attorney Registration and Disciplinary Commission complaint against my attorney, claiming that the allegations regarding his participation in the videotaping of the March 7, 1996 oral argument were totally false; that my supporting affidavit was "bizarre fiction"; and that

a minimal investigation on my attorney's part would have discovered these "facts." I have been told that this is the first time in the history of Illinois that a sitting appellate court justice has filed an ARDC complaint against a private attorney. Subsequently, Justice Thomas failed to support his ARDC complaint with his own affidavit or with counteraffidavits from any of the persons listed in my supporting affidavit or with any other evidence. Because of this, two years later the Inquiry Board of the ARDC dismissed Justice Thomas's complaint.

25. On March 22, 1996, the Second Appellate District affirmed Judge Kilander's entry of the summary judgment in favor of Equitable in a written Illinois Supreme Court Rule 23 Order. That Rule 23 Order, which contained many factual errors, indicated it was authored by Justice Thomas.

26. About a week later, I discovered that in the past Patrolman Mark Collins had sued the Village of Oakbrook Terrace for civil rights violations in Federal District Court. Collins's federal court file contained many examples of Collins's signatures on pleadings and affidavits. Upon looking at those, the signatures by Collins in the federal court file did not appear to match the signature of the responding officer on the December 18, 1992 police report. On June 10, 1996, my attorney telephoned Collins and asked him about the signature discrepancies. In response, Collins stated that he had never taken a stalking report during his entire career on the police force but that he would pull the report, look at it, and then call my attorney the next day. Collins never called my

14

attorney on June 11, 1996 or at any other time. However, on June 11, 1996, the <u>Chicago</u> <u>Tribune</u> reported that defendant William Kallas, then Mayor of the Village of Oakbrook Terrace, had appointed Patrol Officer Mark Collins as Police Chief of the Village's Police Department during the afternoon of June 10, 1996, even though four other village police officers with higher rank and more experience had applied for the job. This promotion doubled Collins's $35,000 yearly salary.

27. I then tried to file two separate complaints against the Oakbrook Terrace Police Department with the DuPage County State's Attorney's Office because of the Police Department's delay of over two years in turning over a copy of the December 18, 1992 report to me. After receiving two declination letters, I had two telephone conversations with John Kinsella, the First Assistant State's Attorney. During those talks, Mr. Kinsella assured me that Gary Stewart, the State's Attorney's primary investigator, had reviewed all of the materials provided to the office by me, had reviewed all the relevant documents at the Oakbrook Terrace Police Department, and had interviewed all of the Oakbrook Terrace police officers involved before coming to the conclusion that there was no evidence of wrongdoing on the part of the Oakbrook Terrace Police Department in taking Passananti's complaint against me. However, I then telephoned Gary Stewart, who told me that he didn't interview anyone at the Oakbrook Terrace Police Department, and that he didn't examine any of the relevant public records maintained at that police department, but that he merely wrote a report to

15

defendant Joseph Birkett concerning his interview with me, the documents that I provided during that interview, and the issues that I had raised. Mr. Stewart then stated that the report went to committee, and the committee decided not to even initiate an investigation into the matter. I then called Mr. Birkett and complained about the failure to investigate. Birkett then told me to complain to Mayor Kallas if I didn't like his office's decision. Birkett then threatened me, stating that I had better not create any problems for the Oakbrook Terrace Police Department if I knew what was good for me. Neither Birkett nor Kinsella told me during these telephone conversations that months earlier Birkett hired Michael Toomey as his chief investigator after Mayor Kallas replaced Toomey with Mark Collins as Police Chief.

28. Within a year of the voluntary dismissal of defendant Armitage, I re-filed my defamation and invasion of privacy suit against Mr. Armitage. Although she was previously told by me that the December 18, 1992 police stalking report had mysteriously appeared three months after summary judgment had been entered in favor of Equitable by Judge Kilander, defendant Linda Spring, who represented defendant Armitage, filed a motion to dismiss my re-filed suit on the basis of collateral estoppel. That motion maintained that defendant Collins had actually taken the stalking report from Passananti on December 18, 1992. Subsequently, Armitage's motion was granted and my re-filed suit was dismissed with prejudice.

16

29. I then was told by the Police Chief of the Wheaton Police Department that the Oakbrook Terrace Police Department, as well as many other police departments located in Chicago's western suburbs, uses a private communications company called DuComm to handle their 911 calls, and that DuComm creates a computerized record for each 911 call called an "incident report" which would include the taking of a police report from a private citizen or a call from an employer about getting police protection from an unruly employee. Because of this, my attorney then made a Freedom of Information Act request to the Oakbrook Terrace Police Department for copies of the DuComm computerized incident reports for my July 1, 1992 termination and for the December 18, 1992 taking of the stalking police report from Passananti. Supposed copies of those DuComm incident reports were later mailed to my attorney by the Police Department. The DuComm incident report for the July 1, 1992 termination indicated that Lt. Carpino and Sgt. DeLaurentis were dispatched to my termination at the Equitable offices but that they went to an address which was more than a mile and a half away from the actual location of those offices. Subsequently, my attorney informally interviewed Richard Bauer, the Deputy Director of DuComm. Mr. Bauer told my attorney that it was impossible for an incorrect address to have been listed on a DuComm incident report because DuComm receives its address information from the telephone company, which information is updated every 24 hours, and also because the responding officers are required to call DuComm once they arrive at the assigned location and confirm the address of

17

that location to the DuComm dispatcher. Obviously, these two DuComm 911 incident reports were fabricated.

30. On February 24, 1997, Judge Kilander's secretary told me over the telephone, at Kilander's direction, that he never received any evidence that I had ever stalked Passananti or 34 other Equitable employees over the telephone, as maintained by attorney Brent Austin in court, and that Austin had failed to supply Judge Kilander with the names of the persons I supposedly stalked or affidavits from the alleged victims, as he was ordered to do. Although Judge Kilander obviously had come to this conclusion prior to the hearing on Equitable's summary judgment motion, he waited until 21 months after entering summary judgment for Equitable to tell me this.

31. On March 6, 1997, I located Susan Iwema through Directory Assistance and called her. She told me she left Equitable in 1993 and that the two white males at my termination who threatened me were not police officers but clients of Passananti. Subsequently, Ms. Iwema told my attorney the same thing and stated she would sign an affidavit to that effect. An affidavit was sent to her, but she did not return it to my attorney. My attorney then sent Ms. Iwema a subpoena for her discovery deposition. Mr. Tibble then filed a Motion to Quash, which was granted. Ms. Iwema's mother later told my attorney that her daughter had not signed the affidavit he sent her on the advice of Douglas Tibble.

32. Because of this information, on May 16, 1997, I filed a coram nobis petition to open up the summary judgment entered in

18

favor of the Equitable defendants on May 17, 1995. That petition stated that the December 18, 1992 police stalking report was fraudulently concealed from me by defendant Tibble and defendant Austin because the material contradictions as to the dates of my supposed stalking contained in that report would have precluded entry of the summary judgment for Equitable because those contradictions as to dates would have raised a material question of fact as to Equitable's claimed defense of conditional privilege, or, in the alternative, that the police report was intentionally fabricated after December 18, 1992 in order to support Equitable's defense to my defamation suit, to support the Equitable's motion for summary judgment, and also to support Passananti's countercomplaint.

33. At the time I filed my coram nobis petition, defendant Kilander was on administrative leave because he had been indicted in the Rolando Cruz matter by a county grand jury. (It was charged that a prosecution team for the DuPage County State's Attorney's office, of which Kilander was first assistant and lead prosecutor, had indicted Rolando Cruz, an Hispanic, on fabricated evidence for the murder of a young white girl.) However, at the time, defendant Kilander was still acting as the Chief Judge of the Civil Division of the DuPage County Courthouse; he assigned my coram nobis petition to defendant Associate Judge Paul Noland.

34. I then had a subpoena issued to the Oakbrook Terrace Police Department, which requested, in part, DuComm's summary incident reports for July 1, 1992 and December 18, 1992, and also

19

employment records for the same days, both of which would establish what took place on those dates and which officers were on duty on those dates. Even though that subpoena sought public records from a public police department, defendant John Pieper, one of the City attorneys for the Village of Oakbrook Terrace and a partner in the law firm of Kubiesa, Spiroff, Gosselar & Pieper, responded by filing a motion to quash the subpoena. Prior to the filing of that motion, both defendant Pieper and defendant Tibble, who now was working for the law firm McBride, Baker & Coles, sent letters to me which threatened me with sanctions if I did not withdraw the coram nobis petition immediately. Subsequently, the police department's motion to quash the subpoena was denied by defendant Noland. However, despite Illinois caselaw to the contrary, defendant Noland then refused to allow my attorney to depose any of the parties or important witnesses, such as defendant Passananti or defendant Susan Iwema, and also refused to allow my attorney to use any other discovery methods other than the subpoena issued to the police department to obtain evidence to support my coram nobis petition.

35. Because the requested documents were not produced by defendant Pieper, my attorney had to file a petition for a rule to show cause. The police department finally filed a response and supplemental response to my subpoena six months after the subpoena had been issued and served. However, that response and supplemental response constituted only a partial answer to the requests in the subpoena. Those incomplete discovery responses did not include the requested summary incident report sheets, but they did contain

20

individual DuComm incident report sheets for July 1, 1992 and December 18, 1992, whose factual information did not match that contained in the individual incident reports for the same dates that my attorney received from the police department via his FOIA request on May 16, 1997. Those discrepancies are present even though the source of the factual information for both sets of individual incident reports should have been the same--DuComm. The police department also refused to produce any employment or personnel records which specifically set forth which officers worked on December 18, 1992 and on July 1, 1992, saying that the Department did not maintain those type of personnel records. This was done despite the fact that I demonstrated that previously the police department had filed written requests with the Illinois Department of Archives, which stated that they did, in fact, maintain such personnel records and wished to destroy them. Because of that refusal, my attorney filed a second Motion to Compel. However, defendant Noland then entered an order which denied that motion, which also cut off any further attempts to compel the police department to produce additional public documents, and which cut off all further discovery. Defendant Noland then retired from the bench, and he was replaced by defendant DuPage County Circuit Court Judge Kenneth Moy.

36. Prior to defendant Noland's retirement, he allowed my attorney to take the discovery deposition of defendants Mark R. Collins and Michael Toomey. During Collins's deposition, he was overly argumentative and refused to answer many of the questions

21

that my attorney asked him. However, Collins said that it was he who signed the December 18, 1992 police stalking report as the responding officer, even though the responding officer's signature did not match the signatures in Collins' federal civil rights file. But Collins refused to answer any of the questions by my attorney regarding how he became police chief of the Village of Oakbrook Terrace when other, more qualified senior officers were trying to get the same position. After the deposition was completed, Collins was given an opportunity by the assigned court reporter to certify that the transcript of his discovery deposition was accurate. He did not respond to the court reporter's notification. During his discovery deposition, Toomey stated that when he received the request from the Illinois Attorney General's Office for a copy of the police report, he turned that request over to Lt. Carpino; that he did not know where Lt. Carpino searched for that report; and that he did not know where Carpino found the report. He said that when Carpino gave him a copy of that report, he merely sent it to me.

37. Defendant Moy also refused to allow my attorney to take the discovery depositions of Passananti and Susan Iwema. Pursuant to a request by Judge Moy, I produced a handwriting analysis of the responding officer's signature on the December 18, 1992 police stalking report by nationally known expert questioned documents examiner Andrew McNichol, who has been certified by the FBI and who, in fact, has been used in the past by McDermott, Will & Emery, Equitable's law firm. Ms. McNichol, after comparing the known

22

signatures of Mark R. Collins to the signature of the responding officer on that police report, concluded that the signature of the responding officer was a blatant forgery. After viewing samples of the signatures of other Oakbrook Terrace police officers contained in Collins's federal civil rights file, Ms. McNichol came to the conclusion that the signature of the responding officer on the subject police report was forged by Sgt. Michael DeLaurentis. However, Judge Moy, once he learned of the results of that handwriting analysis, refused to allow it into evidence in support of my coram nobis petition, finding that the handwriting analysis was not relevant. Three days later, on October 13, 1998, Judge Moy denied my coram nobis petition with prejudice. I then took a direct appeal to the Second Appellate District (Appeal No. 2-98-1467).

38. On October 28, 1998 and on November 18, 1998, I sent a letter to Mayor Kallas which contained a copy of Andrea McNichol's handwriting analysis and which contained my request that he investigate the matter regarding the fact that the signature of the responding officer on the subject police report was not Collins's signature. In response to my contact to Kallas, my attorney received a letter from an attorney representing Collins which threatened a slander suit if I persisted. No investigation was ever carried out by Mayor Kallas.

39. Within 30 days of Judge Moy's order that dismissed my coram nobis petition with prejudice, Equitable and the Village of Oakbrook Terrace and Mark R. Collins filed motions for Illinois Supreme Court Rule 137 attorney fee sanctions against not only me

23

but against my attorney, claiming that the coram nobis petition had been filed for harassment purposes only. Equitable requested sanctions in the amount of $75,000 while the Village and Collins asked for sanctions in the amount of $8,800. The Village and Collins filed their motion for sanctions despite the fact that they were not parties to the coram nobis petition proceedings, and Illinois caselaw requires that anyone who files a Supreme Court Rule 137 sanction petition must be a party to the proceeding. Despite such caselaw, when my attorney filed a motion to strike the fee petition by the Village and Collins, Judge Moy denied that petition. My attorney then had to hire his own attorney to defend against the attorney fee petition. Judge Moy and Douglas Tibble then suggested a settlement arrangement. Judge Moy would enter judgments for the full amount of the requested sanctions against me and my attorney but Equitable would not enforce those judgments if I would sign a release of all my claims against Equitable, which included an agreement that for five years I would not file a federal civil rights action against the Oakbrook Terrace Police Department or talk to the news media. Both Equitable and the Village and Mark Collins put their almost identical settlement demands in writing. However, just before this took place, John Pieper and Kubiesa, Spiroff, Gosselar and Pieper were replaced by defendant Lucy Bednarek and Ancel, Glink, Diamond, Cope and Bush as attorneys for the Oakbrook Terrace Police Department. After the Ancel firm took over, my attorney received the Police Department's

24

written settlement demand. However, both I and my attorney rejected those demands.

40. During several court hearings which took place from December 1998 until the fall of 1999, Judge Moy strongly implied to me and my attorney on the record that he would enter the sanctions not only against me but against my attorney unless he got me to sign the agreements. During that same time period, Judge Moy repeatedly suggested to my attorney that it would be wise if he withdrew his appearance for me. However, on December 16, 1999, the Village and Collins withdrew their motions for sanctions after Collins failed to appear at that evidentiary hearing, even though my attorney had previously served him with a subpoena. Judge Moy then refused my attorney's request that the matter be continued or a bench warrant be issued for Collins. On January 10, 2000, Judge Moy denied Equitable's motion for sanctions. My direct appeal of the denial of my coram nobis petition then proceeded before the Second Appellate District.

41. The Illinois Constitution of 1970 guarantees every litigant who loses in the trial court one direct appeal to the Illinois Appellate Court as a matter of right. One of the primary issues raised on appeal by my attorney was the validity of Judge Moy's refusal to allow into evidence the handwriting analysis of Andrea McNichol in support of my coram nobis petition. I learned from an employee in the clerk's office for the Second Appellate District that my appeal was again taken by Justice Thomas. However, in November of 2000, Justice Thomas was elected to the Illinois

25

Supreme Court and was sworn in as a Justice of that Court during the first week of December, 2000. On March 8, 2001, the Second Appellate District entered a written Supreme Court Rule 23 order which affirmed Judge Moy's denial of my coram nobis petition. However, nowhere in that order was there any discussion of the issue regarding Judge Moy's refusal to allow into evidence the handwriting analysis. That written Rule 23 order indicated it had been authored by Justice Robert Byrne. However, when I telephoned Justice Byrne's secretary, she informed me that Justice Byrne had not authored the Rule 23 order because he had just been appointed to the Court on March 1, 2001, but, according to Justice Byrne, it had been written by Justice Thomas after he had been sworn in as an Illinois Supreme Court Justice.

42. My attorney then filed a Petition for Leave to Appeal to the Illinois Supreme Court. In that petition, my attorney argued that my petition for leave to appeal should be reviewed as a matter of right, rather than as a matter of discretion, because my state constitutional rights had been violated when the Second Appellate District failed to address the issue regarding Judge Moy's refusal to allow Andrea McNichol's handwriting analysis into evidence. At that time, Justice Thomas had been sworn in as an Illinois Supreme Court Justice, and Justice Moses Harrison was the Chief Justice of the Illinois Supreme Court.

43. All seven Justices of the Illinois Supreme Court vote on a pending Petition for Leave to Appeal with a vote of four "yes" votes needed for the PLA to be taken for review. On June 29, 2001,

26

my Petition for Leave to Appeal was supposedly denied by the Illinois Supreme Court. My attorney then filed a Motion for Reconsideration. That Motion for Reconsideration was denied on August 31, 2001. I have learned that Justice Thomas took part in both votes.

44. I telephoned Justice Harrison's office after I learned that my Motion for Reconsideration had been denied on August 31, 2001, and Justice Harrison took my call. Justice Harrison stated to me that he was very surprised when he received my Motion for Reconsideration because he thought my PLA had been taken for review by the Court. This implied to me that the reason for his surprise was that he knew I had received at least the four "yes" votes needed for the PLA to be taken. (The vote on the PLA had been taken in an open meeting because the Illinois Supreme Court was in session.) Justice Harrison then checked with the Illinois Supreme Court's clerk's office as to the vote on my Motion for Reconsideration and was told it was a 7-0 vote against granting the Motion for Reconsideration. However, Justice Harrison stated to me that he knew that such tabulation of the votes by the Clerk's office was incorrect because he had voted to grant my motion for reconsideration. Justice Harrison then said he was sure he was not the only one to vote for granting the motion for reconsideration. Justice Harrison then stated to me that he was aware that in the past there had been unethical manipulations of the Justices' votes by employees of the clerk's office. However, he then said his hands were tied under the circumstances. But he said he would cooperate

27

with a federal investigation if the U.S. Attorney's Office looked into the matter.

45. I received a license to sell securities when I was employed at Equitable in 1989. As stated previously, on May 17, 1995, Judge Kilander awarded Equitable a judgment in the amount of $362.80 against me. After being fired by Equitable on July 1, 1992, I was able to secure another insurance agent position with TransAmerica later that year. At that time, I was able to move my securities license from Equitable to TransAmerica. However, in December of 1995, TransAmerica terminated my broker-dealer relationship with them after my superiors found out that a summary judgment had been entered against me and in favor of Equitable on May 17, 1995. I then had two years from that date to place my securities license with another broker-dealer or that license would automatically expire in December of 1997. Up until April of 1996, I was employed by TransAmerica as an insurance agent with full benefits and insurance. During April of that year, I was demoted to broker status, which had no benefits. This was done apparently because of my suit against the Equitable. I then made numerous attempts to reposition my securities license with other broker dealers because once TransAmerica terminated my broker-dealer relationship I could not sell securities until I repositioned that license. Every broker-dealer that I went to rejected my request that I reposition my securities license with that firm once they found out that the Equitable had obtained a judgment against me. Accordingly, I have not been able to sell securities since December

28

of 1995 because of the judgment in the amount of $362.80 obtained by Equitable.

46. In the last few years, I have contacted Lawrence Gerber, the managing partner of McDermott, Will & Emery, about the actions of Douglas Tibble and Brent Austin in this matter. I have spoken with Robert Schnitz, the managing partner of McBride, Baker & Coles, about Mr. Tibble's actions in this matter, and I have also contacted Robert Shuftan, the managing partner of Wildman, Harrold, Allen & Dixon, about the actions of Linda Spring in this matter. McDermott, Will & Emery did fire Douglas Tibble and Brent Austin because of misconduct on my case. However, Robert Shuftan maintained that the Wildman firm had investigated Linda Spring and had found no wrongdoing on her part. Robert Schnitz indicated that because of the independent contractor set-up at McBride, Baker & Coles, the firm had no way of disciplining Mr. Tibble if he was found to have committed misconduct on my case. None of the aforesaid three law firms offered to compensate me for the violation of my civil rights carried out by their attorneys in my cases in DuPage County. I filed an Attorney Disciplinary complaint in the State of New York against Patrick Caulfield. At the end of last year, Mr. Caulfield and Michael W. Brody, the vice president and in-house corporate counsel who had signed the September 10, 1993 letter to my trial counsel, were fired by Equitable. As of the date of filing this Complaint, Equitable has not given any indication that they are willing to compensate me for the civil

rights violations that I have suffered at the hands of their attorneys and employees.

47. Defendant John Doe and others not presently known to me were, at all times material to this complaint, duly appointed police officers of the City of Oakbrook Terrace. At all times material to this complaint, these defendants acted toward me under color of law. Defendants John Doe and others not presently known to me violated my federal civil rights by fabricating evidence used by the attorneys for Equitable and defendant Michael Armitage to defend against my defamation suit, to support John Passananti's counterclaim, and to support Equitable's Motion for Summary Judgment.

48. Defendant John Doe and others not presently known to me were, at all times material to this complaint, duly appointed associate Circuit Court Judges of DuPage County and/or duly elected or appointed Appellate Court Justices sitting in Illinois' Second Appellate District and/or duly elected Justices of the Illinois Supreme Court. At all times material to this complaint, these defendants acted toward me under color of law. Defendants John Doe and/or others not presently known to me violated my right to due process and my right to use the courts of Illinois to seek redress for damages suffered on account of tortious conduct by unfairly limiting my right to discovery, and by rendering a decision which was not fair and impartial because these defendants were biased against homosexuals and against whistleblowers.

49. Because of prejudice, my attorney tried to move the <u>coram</u> <u>nobis</u> petition. Three times he filed motions for supervisory orders with the Illinois Supreme Court requesting that the petition be moved from DuPage County to Cook County and that the subsequent appeal of Judge Moy's denial be moved from the Second Appellate District to another appellate district. Each time the Illinois Supreme Court Justice elected from the Second Appellate District denied my attorney's requests for a supervisory order. Those requests for a supervisory order were never put to a full court vote before the Illinois Supreme Court.

50. Equitable hired the three private investigators after being notified of the NASD complaint against Passananti in late 1992 in order to get me fired from my new job at TransAmerica Insurance. This was done to retaliate against me because the people at Equitable thought I was a homosexual and also thought I was the whistleblower who had filed the complaint against Passananti with the NASD. These actions constitute a hate crime and unlawful retaliation against a whistleblower. Once I filed my defamation suit in June of 1993, the defendants' strategy changed. They now would prevent me from having my day in court. Although there were a number of public officials and judges involved, the plan was quite simple. The defendants at the Oakbrook Terrace Police Department would fabricate police records to support Equitable's defense to my defamation suit, to support Passananti's countercomplaint, and to support Equitable's Motion for Summary Judgment. Defense counsel for Equitable, Passananti and Armitage

31

would object if I attempted to get documents that supported my case or attempted to depose parties or material witnesses. The defendant circuit court judges would deny my right to discovery by refusing to grant motions to compel and by severely limiting the methods of discovery and the documents I could get. If I called for an investigation, the DuPage County State's Attorney and the Mayor of Oakbrook Terrace would deny my requests. If I appealed, the matter would be controlled in the Second Appellate District by defendant Robert R. Thomas. Justice Thomas was biased against me because he was a friend of defendant Passananti and because Passananti sold insurance policies to him. There is good evidence that Justice Thomas wrote the Rule 23 Order that affirmed Judge Moy's denial of my coram nobis petition, even though at the time Justice Thomas had been sworn in at the Illinois Supreme Court. There is also good evidence that I received enough votes from the seven Supreme Court Justices to take my Petition for Leave to Appeal. However, that vote was changed to show that I did not have enough votes for the Court to review that petition. If I attempted to move my coram nobis petition out of DuPage County or the Second Appellate District because of prejudice, the Illinois Supreme Court Justice elected from the Second District would deny my request for a Supervisory Order. If anyone outside of the inner circle discovered this conspiracy, he would be offered a financial inducement to remain silent. Mark Collins was promoted to Police Chief, which doubled his yearly salary. This second plan by the judges, public officials and defense counsel violates my due process rights and my

constitutional right to use the courts of Illinois to seek restitution for damages suffered as a result of tortious conduct. Under the circumstances, the only place I can get a fair resolution of the matter is in Federal District Court.

WHEREFORE, for the foregoing reasons, the plaintiff pro se, John P. O'Connor, demands judgment against the following defendants for compensatory and punitive damages in an amount in excess of the following respective stated amounts:

Defendant:                                                    Amount:

1. Equitable
2. City of Oakbrook Terrace (Oakbrook
   Terrace Police Department)
3. McDermott, Will & Emery
4. Douglas C. Tibble
5. Marvin Rotter
6. Justice Robert R. Thomas
7. Michael J. Armitage
8. Linda Spring
9. Brent R. Austin
10. Patrick J. Caulfield
11. Michael R. DeLaurentis
12. Mark J. Collins
13. Steven R. Levin
14. Wildman, Harrold, Allen & Dixon
15. Robert K. Kilander
16. Joseph Birkett
17. John Carpino
18. John Passananti
19. McBride, Baker & Coles
20. John N. Pieper
21. Kubiesa, Spiroff, Gosselar & Pieper
22. Ancel, Glink, Diamond, Cope & Bush
23. William J. Kallas
24. Kenneth S. Springer
25. Michael Toomey
26. Kenneth Moy
27. Paul Noland
28. Susan Iwema
29. Michael W. Brody
30. Lucy Bednarek

plus costs of this action.

33

The plaintiff also requests the following additional relief from this Court:

A. That this Court enter a finding that the concerted actions by the defendants in this matter constitute hate crimes against plaintiff and unlawful retaliation against a whistleblower;

B. That this Court refer the present matter to the U.S. Attorney for the Eastern Division of the Northern District of Illinois with the direction that an investigation be initiated to determine whether the concerted actions by defendants in this case constitute federal criminal civil rights violations;

C. That this case be tried by a jury of twelve members; and

D. That this Court grant plaintiff any other relief as this Court deems just, proper and equitable.

JOHN P. O'CONNOR, Plaintiff Pro Se

JOHN P. O'CONNOR, Pro Se
3306 San Martin Circle
Palm Springs, CA 92264-3542
760-323-5129